**PATTERSON et al. v. UNITED STATES.**

No. 7155.

Circuit Court of Appeals, Sixth Circuit.

Nov. 9, 1935.

Rehearing Denied Feb. 6, 1936.

938

Ernest Woodward, of Louisville, Ky. (Leonard S. Coyne, of Detroit, Mich., and Woodward, Dawson & Hobson, of Louisville, Ky., on the brief), for appellants.

Merrill G. Miner, of Detroit, Mich. (Gregory H. Frederick, of Detroit, Mich., on the brief), for the United States.

Before MOORMAN, HICKS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

The indictment charged Patterson, Wingfield, Moore, Smith, and Murray in the first count with purchasing unstamped heroin in violation of the Harrison Anti-Narcotic Act § 1, as amended (Section 692, now section 1043, tit. 26 U. S. C. [26 USCA § 692 now § 1043]); in the second with possessing and facilitating the transportation of heroin which they knew had been unlawfully imported under the Narcotic Import Statute (section 174, tit. 21, U. S. C. [21 USCA § 174]); and in the third with conspiring (tit. 18, § 88, U. S. C. [18 USCA § 88]) to commit the offenses charged in the first and second counts.

The court directed a verdict for Patterson upon the first count, but he was convicted upon the second and third. Wingfield and Moore were convicted on all counts. Smith and Murray were acquitted.

Appellants Patterson, Wingfield, and Moore were sentenced upon the third count alone. They challenge the denial of a directed verdict. Inasmuch as they were sentenced upon the one count only, the question is whether the evidence was sufficient to sustain the verdict thereon. There are certain undisputed facts.

On October 7, 1933, the Audley Farms, of which appellants were employees, had three race horses, Knights Gal, Royal Blunder, and Cloudet, at the state fair grounds race track near Detroit. Patterson was a trainer and manager. Wingfield was in charge of the horses at Detroit, and took his orders from Patterson. Appellant Moore, and Smith, were employed as grooms. Murray was trainer for another stable. Wingfield, Moore, and Murray were at the track on the above date, but Patterson was with other horses at Lincoln Fields, near Chicago.

It was the duty of Oyler and Bell, agents of the Bureau of Narcotics, to investigate the use of narcotics at race tracks, and they were at the Detroit track on October 7. Knights Gal was entered to run at about 4:30 p. m. on that day, and about 3:30 p. m. these two narcotic agents saw Murray and appellant Moore together in a stall occupied by Knights Gal. Moore was in the act of inserting a syringe in the horse's mouth, and both agents testified that Murray was holding the horse by a halter. They arrested both Moore and Murray, and took from Moore the syringe and a small bottle, Exhibit 3, and seized another small bottle, Exhibit 4, which Moore had taken from his pocket, and had dropped on the floor of the stall, after removing the cork. A small packet, containing a powder, Exhibit 4–B, was attached by a rubber band to Exhibit 4. The two small bottles had labels, Exhibits 3–A and 4–A attached. Upon Exhibit 3–A appeared the following notation in pencil: "325-340 Royal Blunder. First dose. Give this dose which"—then an erasure and the following conclusion: "One hour before post time." The notation in pencil upon Exhibit 4–A was as follows: "335 KG. First dose. Give this dose which"—then an erasure, and, "one hour before post time." The syringe and bottles, Exhibits 2 and 3, were found to contain, or to have contained, heroin, a derivative of opium. None of the containers bore internal revenue stamps. The unstamped paper packet, Exhibit 4–B, contained four grains of heroin.

Moore admitted that he received the two bottles (Exhibits 3 and 4) from Wingfield at about 1:30 p. m. with instructions to give the contents to the horses about one hour before running time, but disclaimed any knowledge that the bottles contained narcotics. Wingfield did not testify, but admitted to the agents that he had given the bottles to Moore, and that they contained heroin which he had directed Moore to give to the horses. He admitted further that he had asked Murray to assist Moore. He explained that he had purchased the heroin as well as 47 grains of cocaine, found in his possession, some four years before in Cuba. The agents found in a cigar box in Wingfield's room still another unstamped bottle, Exhibit 11, containing heroin, which bore a label, Ex-

hibit 11–A, reading as follows: "Knights Gal. Give this dose * * * one hour before post time," and also a letter, Exhibit 8, dated September 20, 1933, addressed to Wingfield and signed by Patterson and bearing instructions relative to the three horses, Knights Gal, Royal Blunder, and Cloudet. In it appeared this sentence: "Am sending some bottles along with Morton Smith with full instructions on each." Patterson did send the horses by Smith to Detroit about September 22.

On October 11 the agents interviewed Patterson in Chicago, and he then, as well as later in his testimony, admitted that he wrote the letter to Wingfield dated September 20. He also wrote, for the agents, Exhibit 9, which contains some of the words appearing on the labels of the small bottles, Exhibits 3 and 4. He admitted to the agents that he had sent bottles of medicine to Wingfield at Detroit by Smith, but he denied that he had sent the small bottles, Exhibits 3 and 4, and also denied that he had written the labels thereon. However, Patterson admitted in his testimony not only that he had written Exhibit 8, but also that he had written the instructions on the labels of the small bottles, Exhibits 3 and 4, and that he had sent these bottles to Wingfield by a boy named Stevens, but denied that they contained heroin when they left Chicago. He testified that they contained bromides to be given to the horses for nervousness, and that the instructions on the labels to give a dose to Knights Gal one hour before post time was to settle her nerves. An expert in handwriting testified that the "request" handwriting of Patterson on Exhibit 9 showed a distinct effort to get away from habit.

■ We think the evidence establishes with requisite certainty a preconcerted scheme between appellants not only to administer heroin to the horses (a practice not unlawful in itself), but to accomplish this purpose through a violation of the Harrison Anti-Narcotic Act and the Narcotic Import Act, as charged in the indictment. A full analysis of these acts is found in Copperthwaite v. U. S., 37 F.(2d) 846 (C. C. A. 6). The evidence of at least six of the overt acts charged is substantial.

In its charge the court said: "However, as to the defendant, Wingfield, according to the testimony, it is admitted that he possessed 47 grains of cocaine, charged in that indictment, and being in possession of it is evidence of an unlawful purchase, because there were no stamps on it, and while under the law the court cannot direct a jury to return a verdict of guilty in a criminal case, because it is held to be an invasion of a man's right of trial by jury, yet *I say to you that under the evidence in this case as to Wingfield, under the first count in the indictment, it is your duty to return a verdict of guilty."* (Italics ours.)

The court further said: "I have charged you that under the testimony in this case, under the proofs and the state of the record, it would be your duty to return a verdict of guilty under the second count as to Wingfield."

Upon an exception taken to the above-quoted instructions, the court responded: "I am not directing the jury to return a verdict as to Wingfield. I simply say to you it is your duty under the evidence in this case to return a verdict of guilty as to Wingfield. * * * As to the first count and as to the second count. It remains with you to determine whether you will do that."

■ Appellants urge that these instructions were equivalent to a directed verdict against Wingfield and prejudicial to Patterson and Moore. We are not concerned with their probable effect upon the verdicts on the first and second counts to which they specifically apply, for there was no judgment upon these counts; nor do we think that they were detrimental to the substantial rights of appellants under count 3, which alleged a separate and distinct offense from the substantive offenses charged in the first and second counts. Several of the overt acts alleged in the conspiracy counts bore no relation to the offenses charged in the first and second counts, and there was ample evidence to show that these different overt acts were committed pursuant to the alleged conspiracy, in view of which it cannot be said that the instructions complained of were prejudicial to appellants or influenced the verdict under the third count. The jury was instructed that they did not apply to Wingfield under the third count unless it should find that there was a conspiracy and that he was a member of it. We must assume that it heeded this admonition and gave no weight to the instructions complained of in its consideration of the conspiracy count as against Wingfield, and there is no substantial basis for surmise

that it might have considered them against the other appellants.

The court's opinion as to Wingfield's guilt upon the first and second counts was based upon his admitted possession of cocaine, and there was no evidence that the other appellants were in any way connected with his possession of that particular drug. The charge upon the law relating to conspiracy was fair and unexcepted to.

It is pressed upon us that the court failed to submit to the jury the question whether the confessions of Moore and Murray were voluntarily made. It is enough to say that no request for such an instruction was tendered. Shaw v. U. S., 180 F. 348, 355 (C. C. A. 6).

Appellants also complain that written and oral confessions by Moore and Murray, made after the termination of the conspiracy, were admitted against all appellants without any instruction that they were competent against the makers only. This complaint is not based upon any assignment of error except a general one, and is without merit, since the court at the request of appellants did instruct the jury that no statements made by a defendant after the termination of the conspiracy may be used as evidence against any other defendant; and that such statements to be used against others must have been in furtherance of the object of the conspiracy and during its existence.

The judgment of the District Court is affirmed.